1

2

3

4

5

6          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
7                   AT TACOMA

8   JOSEPH LOCHUCH EWALAN,

9                        Plaintiff,          Case No. C21-5519-BJR-MLP

10          v.

                                             REPORT AND RECOMMENDATION
11   T. ST. GERMAIN, *et al.*,

12                       Defendants.

13

14          I.      INTRODUCTION AND SUMMARY CONCLUSION

15          This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Joseph Ewalan is

16   currently confined at the Washington State Penitentiary ("WSP") in Walla Walla, Washington.

17   The claims asserted in this action relate to a hand injury Plaintiff sustained during an altercation

18   with another inmate at the Stafford Creek Corrections Center ("SCCC") in 2019. In particular,

19   Plaintiff alleges that Defendants violated his federal constitutional rights when they were

20   deliberately indifferent to his serious medical needs and when they failed to properly respond to

21   his grievances regarding the medical care provided for his hand injury. (*See* Am. Compl. (dkt.

22   # 13).)

23

REPORT AND RECOMMENDATION
PAGE - 1

This matter is now before the Court on Defendants' motion for summary judgment ("Defendants' Motion"). (Defs.' Mot. (dkt. # 42).) Defendants have submitted in support of their motion the declarations of: Defendants' Counsel Mark Rachel (Second Rachel Decl. (dkt. # 43)); Defendant Dennis Dahne (Dahne Decl. (dkt. # 44)); Washington Department of Corrections ("DOC") Health Records Technician Carey Flewelling (Flewelling Decl. (dkt. # 45)); Defendant Erin Lystad (Lystad Decl. (dkt. # 46)); and Defendant Troy St. Germain (St. Germain Decl. (dkt. # 47)). Defendants subsequently submitted praecipes containing exhibits erroneously omitted from Mr. Rachel's declaration (Rachel Ex. (dkt. # 49)), and from Defendant Lystad's declaration (Lystad Ex. (dkt. # 50)). Plaintiff filed a response (Pl.'s Resp. (dkt. # 53)) together with declarations in support (Pl.'s Decls. (dkt. # 54)), and Defendants filed a reply (Defs.' Reply (dkt. # 55)).[1] In addition, Plaintiff has also filed a motion seeking admission of his personal diary (dkt. # 52).

The Court, having reviewed Defendants' Motion, all related briefing, and the balance of the record, concludes that Defendants' Motion (dkt. # 42) should be GRANTED and that Plaintiff's amended complaint (dkt. # 13), and this action, should be DISMISSED with

---

[1] Defendants note in their reply that Plaintiff's response was untimely as it was not filed until September 14, 2022, two days after it was due. (Defs.' Reply at 2.) Defendants, however, do not move to strike the response. They do move to strike the declarations submitted by Plaintiff in support of his response (*see* Pl.'s Resp. at 44-46, Pl.'s Decls.) on the grounds that they do not contain any competent evidence. (Defs.' Reply at 3-4.)

The Court observes that not only was Plaintiff's response untimely (*see* Local Civil Rule ("LCR") 7(d)(3)), it also far exceeds the twenty-four page limitation applicable to such briefs (*see* LCR 7(e)(3)). The Court has nonetheless accepted and considered Plaintiff's brief despite these deficiencies. The Court has not considered Plaintiff's declarations, which essentially contain additional argument and citations to authority rendering them indistinguishable from the underlying briefing. The Court has likewise not considered Plaintiff's "Re-Reply" brief, filed September 21, 2022. (Dkt. # 56.) Plaintiff's "Re-Reply" is essentially a surreply, but it does not comport with the requirements of LCR 7(g) which provides that a surreply is limited to addressing a request to strike materials contained in or attached to a reply brief. Plaintiff's brief merely contains arguments in response to Defendants' reply, which is not permitted under LCR 7(g)(2). (*See id.*)

REPORT AND RECOMMENDATION
PAGE - 2

prejudice. This Court further concludes that Plaintiff's motion for admission of his personal diary (dkt. # 52) should be DENIED.

## II.    BACKGROUND

### A.    Medical Care

On October 4, 2019, while Plaintiff was confined at the SCCC, he was involved in an altercation with his cellmate during which he sustained an injury to his right hand.[2] Plaintiff was examined by a nurse within approximately two hours of his injury. (First Rachel Decl. (dkt. # 27-1), Ex. A (Pl.'s Dep. Vol. I at 44:7-9, 47:13-25).) According to Plaintiff, the nurse examined his hand through a window in an Intensive Management Unit ("IMU") holding cell, inquired about his pain and his impression of the nature of the injury, and asked whether he had any other injuries. (Am. Compl. at 5; First Rachel Decl., Ex. A (Pl.'s Dep. Vol. I at 46:12-47:8).)

The following morning, October 5, 2019, Defendant St. Germain evaluated Plaintiff for a hand injury. (St. Germain Decl. at ¶ 4, Ex. A.) Defendant St. Germain noted that Plaintiff was complaining of pain in the fourth and fifth fingers of his right hand and that the hand was swollen and tender in that area. (*Id*. at ¶ 5, Ex. A.) Defendant St. Germain contacted the on-call health provider, physician assistant ("PA") Scott Light, to consult about an appropriate course of treatment and to obtain medical orders for Plaintiff's care. (*Id*. at ¶ 6, Ex. A.) PA Light ordered that diagnostic imaging of Plaintiff's right hand be conducted the following Monday, October 7, 2019, and that Plaintiff be seen in-person by a healthcare provider that day as well. (*See id*.) PA

---

[2] Plaintiff asserts in his amended complaint, and at his deposition, that he suffered the injury to his hand when he was assaulted by his cellmate. (*See* Am. Compl. at 4-5; Rachel Ex. A (Pl.'s Dep. Vol. III at 154:1-160:25).) Other evidence in the record suggests that Plaintiff assaulted his cellmate by striking him with a closed fist. (*See* Lystad Decl. at ¶ 4; Lystad Ex. A.) However, the origin of Plaintiff's hand injury is not relevant to the claims asserted in this action, and thus, any factual dispute surrounding this issue is not material nor precludes entry of summary judgment in favor of Defendants.

REPORT AND RECOMMENDATION
PAGE - 3

Light also ordered two pain medications for Plaintiff, as well as ice and a sling if allowed by the terms of Plaintiff's custody. (*See id*.; *see also* First Rachel Decl., Ex. A (Pl.'s Dep. Vol. I at 58:4-62:15).)

On October 7, 2019, pursuant to PA Light's orders, diagnostic imaging was conducted on Plaintiff's injured right hand and Plaintiff was seen by Defendant Lystad for further evaluation and treatment of the injured hand. (Lystad Decl. at ¶ 3; Lystad Ex. A.) During this appointment, Defendant Lystad noted swelling in Plaintiff's right hand around the fifth finger. (Lystad Decl. at ¶ 5; Lystad Ex. A.) She also tested Plaintiff's range of motion and pain sensitivity and reviewed the x-rays that had been previously ordered. (*See id*.) The x-rays showed that Plaintiff's fifth finger was fractured. (*See* Lystad Exs. B-C.) Defendant Lystad placed an ulnar gutter splint around Plaintiff's fourth and fifth fingers, and directed him to wear it until he received further instructions, to keep it dry, to elevate his hand, and to take pain medication as needed. (Lystad Decl. at ¶ 6; Lystad Ex. A.)

Defendant Lystad thereafter initiated the process for scheduling a one-week follow-up appointment for Plaintiff with a fellow DOC provider, Bobbie Berkey. (Lystad Decl. at ¶ 7; Lystad Ex. A.) Defendant Lystad also contacted a DOC consulting physician, orthopedist Kenneth Sawyer, M.D., seeking advice as to whether Plaintiff would need surgical repair for his fractured finger. (Lystad Ex. C.) On October 9, 2019, Dr. Sawyer responded to Defendant Lystad's inquiry, indicating that Plaintiff should do well in the ulnar gutter splint and should stay in the splint for four to five weeks. (Lystad Decl. at ¶ 9; Lystad Ex. C at 2.) Defendant Lystad sent Plaintiff a health services kite the same day advising him of Dr. Sawyer's recommendation that he stay in the splint for four to five weeks and noting as well that surgical repair was not deemed necessary at that time. (Lystad Decl. at ¶ 10; Lystad Ex. D.)

REPORT AND RECOMMENDATION
PAGE - 4

On the same date, October 9, 2019, Plaintiff removed the splint that Defendant Lystad had placed on his hand, despite having been advised that he needed to remain in the splint for a number of weeks. (*See* Flewelling Decl., Ex. A at 2; First Rachel Decl., Ex. A (Pl.'s Dep. Vol. I at 86:5-88:3).) Plaintiff thereafter filed medical kites asking to have the splint fixed because he could not get it put back on properly. (*See* Flewelling Decl., Ex. A at 2-3.) Plaintiff was scheduled for an appointment on October 16, 2019, apparently with PA Berkey, but Plaintiff refused the appointment because he had been scheduled for "sick call," which required a $4 co-pay, instead of for a "follow-up" appointment. (*See* Lystad Ex. A; Flewelling Decl., Ex. A at 3-4; Pl.'s Ex. (dkt. # 13-1) at 10-11.) Plaintiff believed he should have been scheduled for a follow-up appointment because the issue he was seeking treatment for was not a new issue. (*Id*.) Plaintiff filed additional health services kites complaining about the $4 co-pay after he refused the appointment scheduled for him, but he did not specifically request additional care. (*See* Pl.'s Ex. at 10-11.)

## B.    Grievances

On October 7, 2019, apparently before Plaintiff was seen by Defendant Lystad, Plaintiff submitted a grievance in which he complained that after being escorted to the IMU on October 4, 2019, "with a broken hand and head concussion," he was in pain, but the nurses refused to provide him pain medications. (Dahne Decl., Ex. A at 1.) Plaintiff also complained that he had yet to be seen by a doctor and that he had not been afforded a shower in over 72 hours. (*Id*.) Defendant Dahne responded on October 11, 2019, advising Plaintiff that his medical concerns would be addressed through that grievance, but he would have to file a separate grievance if he wished to pursue his concerns regarding showers. (*Id*.)

REPORT AND RECOMMENDATION
PAGE - 5

On October 25, 2019, Plaintiff submitted another grievance that he identified as an "appeal" of his original grievance. (Dahne Decl., Ex. A at 2.) In response, Defendant Dahne advised Plaintiff that his original grievance had been accepted at "level I" on October 23, 2019, and asked that Plaintiff await a response to that grievance before filing an appeal. (*Id*.) Shortly thereafter, Plaintiff submitted another grievance that he again identified as an appeal of his original grievance. (*Id*. at 3.) Defendant Dahne advised Plaintiff that his grievance was still pending investigation and again requested that Plaintiff wait for a response before submitting an appeal. (*Id*.) On November 6, 2019, Defendant Dahne notified Plaintiff that the person assigned to investigate his grievance had requested an extension of time to complete their assessment and that the response date had been extended to December 9, 2019. (*Id*. at ¶ 6, Ex. A at 4.)

On January 22, 2020, Defendant Dahne provided a response to Plaintiff's original grievance. (Dahne Decl. at ¶ 6, Ex. A at 5.) By that time, Plaintiff had been transferred to another facility.[3] The response indicated that Plaintiff had not been interviewed "due to a recent transfer." (*Id*., Ex. A at 5.) It also noted that Plaintiff's medical file was not available for review because it had been transferred as well. (*Id*.) Substantively, based solely upon a review of Plaintiff's medical care in the DOC's Offender Management Network Information ("OMNI") system, the response concluded that there was no evidence to support Plaintiff's claim of inadequate medical care, and it encouraged Plaintiff to address any ongoing concerns with the medical staff at his current facility. (*Id*.)

On January 26, 2020, Plaintiff submitted an appeal of the grievance response. (*See* Pl.'s Resp. at 90.) The appeal paperwork shows that it was initially processed by Defendant Dahne at

---

[3] According to Plaintiff, he was transferred from SCCC to WSP on December 30, 2019. (*See* dkt. # 13-2 at 2.)

REPORT AND RECOMMENDATION
PAGE - 6

SCCC, even though Plaintiff was by then housed at WSP, and that it was investigated by SCCC

Facility Medical Director Dr. Herrington. (*See id*.) A response to the appeal was not provided

until May 17, 2021. (*Id*.) The response indicated that a consult for a hand specialist had been

requested. (*See id*.)

Plaintiff appealed this response to the final level of the grievance process. (Pl.'s Resp. at

92.) Plaintiff asserted in his appeal that his hand had healed crookedly and he was unable to lift

things, and he requested that he be provided surgical repair of his hand without further

examination. (*Id*.) The response to this appeal, which was provided on June 30, 2021, noted that

an orthopedic consult had been requested by Dr. Herrington and had been scheduled for the

following month. (*Id*. at 95.) Plaintiff was seen by the orthopedist on July 27, 2021. (*Id*. at

93-94.) Additional x-rays were taken, and the orthopedist recommended physical therapy. (*Id*. at

93.) Plaintiff testified at his deposition that he subsequently saw another specialist who indicated

that he could try to fix Plaintiff's injury, but that it could make Plaintiff's ongoing hand problems

worse. (*See* First Rachel Decl., Ex. A (Pl.'s Dep. Vol. I at 110:23-111:13).)

## III.    DISCUSSION

### A.    Applicable Legal Standards

#### 1.    *Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The moving party is entitled to judgment as a matter of law when the non-moving party

fails to make a sufficient showing on an essential element of his case with respect to which he

has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving

party bears the initial burden of showing the district court "that there is an absence of evidence to

REPORT AND RECOMMENDATION
PAGE - 7

1  support the nonmoving party's case." *Id*. at 325. The moving party can carry its initial burden by

2  producing affirmative evidence that negates an essential element of the non-movant's case, or by

3  establishing that the non-movant lacks the quantum of evidence needed to satisfy its burden of

4  persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102

5  (9th Cir. 2000). The burden then shifts to the non-moving party to establish a genuine issue of

6  material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The

7  Court must draw all reasonable inferences in favor of the non-moving party. *Id*. at 585-87.

8  In supporting a factual position, a party must "cit[e] to particular parts of materials in the

9  record . . .; or show[] that the materials cited do not establish the absence or presence of a

10  genuine dispute, or that an adverse party cannot produce admissible evidence to support the

11  fact." Fed. R. Civ. P. 56(c)(1). The non-moving party "must do more than simply show that there

12  is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at

13  585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over

14  facts that might affect the outcome of the suit under the governing law will properly preclude the

15  entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)

16  (emphasis in original). The central issue is "whether the evidence presents a sufficient

17  disagreement to require submission to a jury or whether it is so one-sided that one party must

18  prevail as a matter of law." *Id*. at 251-52.

19  The opposing party must present significant and probative evidence to support its claim

20  or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

21  "The mere existence of a scintilla of evidence in support of the non-moving party's position is

22  not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d

23  1216, 1221 (9th Cir. 1995). Nor can the non-moving party "defeat summary judgment with

REPORT AND RECOMMENDATION
PAGE - 8

allegations in the complaint, or with unsupported conjecture or conclusory statements."

*Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003).

>    *2.    Section 1983 Standard*

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show that: (1) he suffered a violation of rights protected by the Constitution or created by federal statute; and (2) the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

> **B.    Medical Care Claims**

Plaintiff alleges that Defendants St. Germain, Lystad, and Dahne all violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical needs. (*See* Am. Compl.) At issue is the adequacy of the medical care Plaintiff received for the hand injury he sustained while confined at SCCC in 2019.

>    *1.    Eighth Amendment Standard*

The Eighth Amendment imposes a duty upon prison officials to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking

REPORT AND RECOMMENDATION
PAGE - 9

1    reasonable measures to guarantee the safety of inmates. *Id*. In order to establish an Eighth

2    Amendment violation for inadequate medical care, a plaintiff must demonstrate that he had a

3    "serious medical need," and that defendants' response to that need was deliberately indifferent.

4    *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin v. Smith,* 974 F.2d 1050,

5    1059 (9th Cir.1991), *overruled on other grounds by WMX Techs., Inc. v. Miller,* 104 F.3d 1133

6    (9th Cir. 1997) (en banc)). A medical need is serious if failure to treat the prisoner's condition

7    "could result in significant injury or the 'unnecessary and wanton infliction of pain.'" *Id*. A

8    prison official is deliberately indifferent to a serious medical need if he "knows of and disregards

9    an excessive risk to inmate health." *Farmer*, 511 U.S. at 837. The Ninth Circuit has explained

10   that "[p]rison officials are deliberately indifferent to a prisoner's serious medical needs when

11   they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d

12   732, 744 (9th Cir. 2002) (internal quotation marks omitted).

13       A mere difference of opinion concerning proper medical care is not sufficient to establish

14   deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Sanchez v.*

15   *Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). In order to prevail on an Eighth Amendment claim

16   which involves choices between alternative courses of treatment, a plaintiff must show "that the

17   course of treatment the doctors chose was medically unacceptable under the circumstances . . .

18   [and] that they chose this course in conscious disregard of an excessive risk to plaintiff's health."

19   *Id*. at 332 (citations omitted).

20       Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060

21   (9th Cir. 2004). An inadvertent or negligent failure to provide adequate medical care is

22   insufficient to establish a claim under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97,

23   105-06 (1976); *see also Farmer*, 511 U.S. at 835 ("ordinary lack of due care" is insufficient to

REPORT AND RECOMMENDATION
PAGE - 10

1  establish an Eighth Amendment claim). "A defendant must purposely ignore or fail to respond to

2  a prisoner's pain or possible medical need in order for deliberate indifference to be established."

3  *McGuckin*, 974 F.2d at 1060.

4       2.    *Analysis*

5       Defendants first argue that Plaintiff offers no competent medical evidence that his finger

6  fracture constituted a serious medical need.[4] (Defs.' Mot. at 7.) However, there is no dispute that

7  Plaintiff's finger was actually fractured, or that the injury caused pain and swelling. The

8  evidence in the record also demonstrates that the injury required immobilization for a period of

9  weeks to facilitate proper healing and that the lack of immobilization likely caused the injury to

10 heal incorrectly, resulting in occasional pain during certain activities. (*See* Lystad Decl. at ¶¶ 5-6,

11 9-11; Lystad Exs. C-D; Pl.'s Resp. at 93-94.) Thus, for purposes of the instant motion, this Court

12 concludes that Plaintiff's medical need was sufficiently serious to warrant Eighth Amendment

13 protections.

14      In this Court's view, the dispositive question is whether any of the three named

15 Defendants was deliberately indifferent to Plaintiff's serious medical need. The evidence in the

16 record demonstrates that they were not. The Court will address Plaintiff's claims against each

17 Defendant in turn.

18           a.    Defendant St. Germain

19      Plaintiff's deliberate indifference claim against Defendant St. Germain arises out of a

20 purported interaction between Plaintiff and Defendant St. Germain on October 4, 2019, the day

21

22 _____
   [4] Plaintiff's response repeatedly refers to both a broken wrist and a fractured finger. (*See* Pl.'s Resp.)
   However, there is no evidence whatsoever that Plaintiff suffered a broken wrist in the altercation
23 underlying his current medical care claims.

REPORT AND RECOMMENDATION
PAGE - 11

1    Plaintiff sustained the injury to his hand. (*See* Am. Compl. at 5-10; *see also* First Rachel Decl.,

2    Ex. A (Pl.'s Dep. Vol. I at 44:7-10, 47:12-25).) Plaintiff asserts that Defendant St. Germain

3    examined his injured right hand after he had been transferred to a holding cell in the IMU. (Am.

4    Compl at 5.) Plaintiff complains that though Defendant St. Germain observed that the hand was

5    swollen and had signs of immobility, and knew Plaintiff was in extreme pain, Defendant St.

6    Germain declined Plaintiff's request to call an emergency so that he could be taken to the

7    infirmary for further treatment and refused Plaintiff's request for pain medication. (*See id*. at

8    5-7.)

9            The evidence in the record, which includes Plaintiff's deposition testimony and

10    Defendant St. Germain's declaration, makes clear that Plaintiff has misidentified Defendant St.

11    Germain as the nurse who examined him on the day he sustained the injury. Plaintiff was asked

12    at his deposition to describe the first medical person he saw regarding his hand injury, the person

13    whom Plaintiff believed to be Troy St. Germain. (First Rachel Decl., Ex. A (Pl.'s Dep. Vol. I at

14    44:7-13).) Plaintiff described this individual as a "fairly short woman" of mixed race. (*Id*. (Pl.'s

15    Dep. Vol. I at 44:14-46:11).) In addition, Plaintiff consistently refers to this individual as "she"

16    and "her" throughout his amended complaint and in his response to Defendants' Motion. (*See*

17    Am. Compl. at 5-10; Pl.'s Resp. at 4-6, 15-21.)

18            Defendant St. Germain makes clear that he is neither short nor female, but is instead a

19    tall, white male with what he describes as a baritone voice. (St. Germain Decl. at ¶ 3.) In other

20    words, not an individual likely to be mistaken for the nurse Plaintiff described seeing in the IMU

21    on October 4, 2019. Defendant St. Germain also makes clear that though he did see Plaintiff for

22    his hand injury in the course of his duties as a nurse at SCCC, this encounter occurred on

23    October 5, 2019, the day following the incident which resulted in the injury. (*Id*. at ¶ 4.)

REPORT AND RECOMMENDATION
PAGE - 12

Defendant St. Germain's notes of his encounter with Plaintiff indicate that he evaluated Plaintiff's hand and contacted the on-call healthcare provider, PA Light, to help determine an appropriate course of treatment for Plaintiff. (*See id*. at ¶¶ 4, 6, Ex. A.) Pursuant to PA Light's orders, Defendant St. Germain submitted a request for x-rays of Plaintiff's right hand and took steps to schedule an in-person visit with a provider. (*See id*. at ¶¶ 6-9, Exs. A-E.) PA Light also recommended pain medications, ice, and a sling as allowed by the terms of Plaintiff's custody. (*Id*. at ¶ 6.)

Plaintiff acknowledged at his deposition that after his encounter with the female nurse in the IMU on October 4, 2019, and before seeing Defendant Lystad on October 7, 2019, he saw another nurse whom he described as a tall white man. (*See* First Rachel Decl., Ex. A (Pl.'s Dep. Vol. I at 57:14-58:16).) Plaintiff testified that this male nurse attempted to stabilize his hand by placing his hand and arm in a sling and also provided pain medications. (*See id*. (Pl.'s Dep. Vol. I at 59:1-62:15).) Though Plaintiff described this encounter as having taken place on Sunday, October 6, 2019 (*see id*. (Pl.'s Dep. Vol. I at 58:4-8)), a reasonable inference from the evidence is that the encounter Plaintiff described was the one he had with Defendant St. Germain on Saturday, October 5, 2019.

Plaintiff does not assert any claims challenging the adequacy of the care he received during the weekend medical appointment immediately preceding his visit with Defendant Lystad, and there is nothing in the record demonstrating that Defendant St. Germain at any time acted with deliberate indifference to Plaintiff's medical needs. Defendant St. Germain is therefore entitled to summary judgment with respect to Plaintiff's Eighth Amendment claim.

//

//

REPORT AND RECOMMENDATION
PAGE - 13

b.    <u>Defendant Lystad</u>

Plaintiff's deliberate indifference claim against Defendant Lystad concerns her alleged actions/inaction in the days following her October 7, 2019, encounter with Plaintiff. It was during this initial encounter that Defendant Lystad placed an ulnar gutter splint on Plaintiff's right hand, the purpose of which was to immobilize Plaintiff's injured finger and to minimize any potential deformity or abnormal function during the healing process. (Lystad Decl. at ¶¶ 3, 6, 11.) Plaintiff alleges that in the ensuing days, Defendant Lystad ignored his emergency calls and health services kites seeking follow-up care to fix his splint after he prematurely removed it, and that she failed to schedule him for a follow-up appointment three weeks after the initial appointment as recommended by the DOC orthopedist, Dr. Sawyer.[5] (*See* Am. Compl. at 12-13, 15-16.) Plaintiff claims that if Defendant Lystad had followed Dr. Sawyer's recommendations, or responded to Plaintiff's requests for emergency care, there might have been an opportunity to treat his injury and fix his splint. (*Id*. at 13.)

There is no evidence in the record to support Plaintiff's assertion that Dr. Sawyer recommended that Plaintiff be seen for a follow-up appointment after three weeks of wearing the splint. Dr. Sawyer recommended only that Plaintiff stay in the splint for four to five weeks and that the afflicted fingers be buddy taped for an additional month. (Lystad Ex. C at 2.) Defendant Lystad specifically conveyed to Plaintiff, after receiving Dr. Sawyer's recommendation, that the splint should stay on for four to five weeks. (*See id*., Exs. C-D.) Thus, to the extent Plaintiff asserts that Defendant Lystad was deliberately indifferent to his serious medical needs when she

---

[5] Plaintiff's statement of his claim against Defendant Lystad in his amended complaint is not particularly clear. However, Plaintiff appeared to confirm during his deposition that these are the claims he intends to assert against Defendant Lystad. (*See* First Rachel Decl., Ex. A (Pl.'s Dep. Vol. I at 73:12-78:16, 80:21-82:5).)

REPORT AND RECOMMENDATION
PAGE - 14

1  failed to follow Dr. Sawyer's recommendation that Plaintiff receive a follow-up appointment

2  after three-weeks, his deliberate indifference claim fails.

3        With respect to Plaintiff's claim that Defendant Lystad failed to respond to his

4  emergency calls and health services kites seeking follow-up care, Plaintiff also fails to

5  demonstrate that Defendant Lystad was deliberately indifferent to his serious medical needs. The

6  evidence in the record demonstrates that when Defendant Lystad saw Plaintiff on October 7,

7  2019, she instructed him to wear the splint until he received further instructions. (Lystad Decl. at

8  ¶ 6.) Defendant Lystad thereafter began the process of scheduling a follow-up appointment for

9  Plaintiff with a colleague one week later. (*See id*.; Lystad Ex. B.) Plaintiff, contrary to Defendant

10  Lystad's directives, removed the splint after only two days, the same day Defendant Lystad

11  advised Plaintiff that Dr. Sawyer recommended he stay in the splint for four to five weeks. (First

12  Rachel Decl., Ex. A (Pl.'s Dep. Vol. I at 86:3-88:3); Lystad Ex. D.)

13        When Plaintiff was unable to put the splint back on properly, he sought follow-up care to

14  have the splint fixed. (Flewelling Decl., Ex. A at 2-4; Pl.'s Ex. at 9-11.) An appointment was

15  scheduled for Plaintiff on October 16, 2019, so that his concerns could be addressed, but Plaintiff

16  refused the appointment because of his objection to the appointment being identified as "sick

17  call" rather than as a "follow up" for an existing issue. (*See id*.) Plaintiff's specific objection was

18  to the $4 co-pay assessed for "sick call visits," which Plaintiff believed constituted "extortion"

19  and was being used as an excuse to deny him care. (*See* Pl.'s Ex. at 10-11.) The evidence in the

20  record demonstrates that Plaintiff's alleged inability to access necessary care was attributable to

21  his own refusal to comply with the rules for obtaining such care and not to any outright denial of

22  care by the SCCC staff.

23

REPORT AND RECOMMENDATION
PAGE - 15

1    The Court observes as well that while Plaintiff asserts that it was Defendant Lystad who

2    refused him care by failing to respond to his emergency calls and his health services kites, it is

3    not clear from the record how many of those requests for care were communicated to Defendant

4    Lystad. The evidence in the record shows that Plaintiff submitted a health services kite on

5    October 9, 2019, which was directed to three members of the SCCC health services staff,

6    including Defendant Lystad. (Flewelling Decl., Ex A at 2.) The nurse who responded to the kite

7    advised Plaintiff that she had reviewed Defendant Lystad's notes and she reiterated Defendant

8    Lystad's prior instructions about keeping the splint on, elevating the hand, and using ibuprofen.

9    (*Id*.) The nurse also advised Plaintiff of the procedure that had to be followed to obtain medical

10   care in the IMU. (*Id*.)

11       Plaintiff submitted another kite on October 10, 2019, which he appeared to direct

12   specifically to Defendant Lystad, and the response to that kite was that Plaintiff had been

13   scheduled for an appointment the following week to address his concerns. (Flewelling Decl., Ex.

14   A at 3.) As noted above, Plaintiff refused that appointment. Plaintiff's subsequent kites were not

15   directed to Defendant Lystad, and in any event, merely reiterated Plaintiff's objections to the $4

16   co-pay. (*See* Pl.'s Ex. at 10-11.)

17       In sum, there is no evidence in the record demonstrating that Defendant Lystad was

18   deliberately indifferent to Plaintiff's medical needs in relation to his requests for follow-up care

19   to fix his splint. Defendant Lystad is entitled to summary judgment with respect to Plaintiff's

20   Eighth Amendment claim.

21                      c.      Defendant Dahne

22       Plaintiff's medical deliberate indifference claim against Defendant Dahne arises out of a

23   grievance submitted by Plaintiff on October 7, 2019, complaining that he had been denied

REPORT AND RECOMMENDATION
PAGE - 16

1    medical care for injuries suffered in the altercation with his cellmate on October 4, 2019.[6] (*See*

2    Am. Compl. at 17; Dahne Decl., Ex. A at 1.) Plaintiff asserted in his grievance that after being

3    escorted to the segregation unit with a "broken hand and head concussion," the nurse refused to

4    provide him pain medication and he had not been seen by a doctor. (Dahne Decl., Ex. A at 1.)

5    Defendant Dahne, who is a grievance coordinator at SCCC and not a medical professional,

6    accepted the grievance as to the medical portion of the complaint and apparently assigned the

7    grievance to a member of the SCCC medical staff for investigation.[7] (*See* Dahne Decl. at ¶ 3, Ex.

8    A at 5.) Plaintiff, however, claims that Defendant Dahne ignored his grievance, turning a "blind

9    eye" to Defendant Lystad's unconstitutional conduct and thereby participating in the denial of

10    his Eighth Amendment rights. (*See* Am. Compl. at 17-23; First Rachel Decl., Ex. A (Pl.'s Dep.

11    Vol. I at 88:15-92:5, 95:22-96:7).)

12            The Court notes that Plaintiff, in his original grievance, makes no mention of Defendant

13    Lystad, and in fact, Plaintiff had apparently yet to see Defendant Lystad at the time he submitted

14    the grievance. (*See* Dahne Decl, Ex. A at 1.) Plaintiff thereafter submitted two additional

15    complaints under the same grievance number which he denominated as appeals. (*Id.*, Ex. A at

16    2-3.) Plaintiff's submissions were not accepted by Defendant Dahne because his original

17    grievance was still pending investigation. (*See id.*) Plaintiff's position appears to be that

18    Defendant Dahne should have gleaned from these improperly filed appeals that Plaintiff was

19    being denied medical treatment by Defendant Lystad and that his needs were emergent.

20    _____

21    [6] Plaintiff alleges in his amended complaint that he filed his initial grievance on October 17, 2019, but the
      actual grievance, submitted as an exhibit to Defendant Dahne's declaration, shows that Plaintiff signed

22    the grievance on October 7, 2019—before he was seen by Defendant Lystad—and that Defendant Dahne
      received the grievance on October 11, 2019. (*See* Am. Compl. at 17; Dahne Decl, Ex. A at 1.)

23    [7] Plaintiff's grievance also included complaints regarding the denial of showers and yard time that would
      have permitted him to use the telephone. (*See* Dahne Decl., Ex. A at 1, 5.)

REPORT AND RECOMMENDATION
PAGE - 17

1    However, Plaintiff's subsequent grievance submissions were primarily focused on his objections

2    to the way in which he was being scheduled for requested care and to the assessment of a $4

3    co-pay which he believed to constitute "punishment." (*See id.*)

4         Plaintiff has not demonstrated that Defendant Lystad was deliberately indifferent to his

5    serious medical needs. Plaintiff's claim against Defendant Dahne is based upon his contention

6    that Defendant Lystad was engaged in unconstitutional conduct and that Defendant Dahne failed

7    to intervene and ensure Plaintiff received the necessary care. As discussed above, Plaintiff

8    apparently had access to care, but merely objected to the way in which it was being offered.

9    Accordingly, Defendant Dahne is entitled to summary judgment with respect to Plaintiff's

10   Eighth Amendment claim.

11        **B.    Grievance Process**

12        Plaintiff next alleges that Defendant Dahne violated his due process rights and First

13   Amendment rights when he failed to investigate or respond to Plaintiff's grievance regarding

14   medical care. (*See* Am. Compl. at 17-23; First Rachel Decl., Ex. A (Pl.'s Dep. Vol. I at

15   94:1-98:2, 101:9-102:21).) However, a prisoner does not have a constitutional right to a specific

16   grievance procedure. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *Mann v. Adams*,

17   855 F.2d 639, 640 (9th Cir. 1988). Here, Plaintiff's claim goes directly to the execution of the

18   grievance process at SCCC in relation to Plaintiff's grievance regarding the denial of medical

19   care. Thus, any claim alleging deficiencies in the grievance process necessarily fails to state a

20   claim for relief under § 1983.

21        While Plaintiff's claim regarding the functioning of the grievance process at SCCC fails

22   to state a constitutional claim for relief, the clear deficiencies in the process, at least with respect

23   to the processing of Plaintiff's grievance, are worthy of note. Plaintiff submitted his grievance

REPORT AND RECOMMENDATION
PAGE - 18

complaining that he was being denied medical care on October 7, 2019. (*See* Dahne Decl., Ex. A at 1.) The grievance was not even formally accepted until October 23, 2019, over two weeks later. (*See id*. at 1-2.) The grievance was assigned to a member of the SCCC medical staff for investigation at some unspecified point in time, and on November 6, 2019, the investigator requested an extension of time to complete the investigation. (*Id*. at 4.) The investigator was granted an extension of time until December 9, 2019, to provide a response to Plaintiff's grievance. (*Id.*)

Ultimately, a response was not provided until January 22, 2020, over a month and a half after the extended deadline had passed. (Dahne Decl., Ex. A at 5.) A review of the response suggests that the investigator did not even begin the investigation into Plaintiff's grievance until after December 30, 2019, the day Plaintiff indicates he was transferred from SCCC to WSP. (*See* dkt. # 13-2 at 2.) The grievance response indicates that Plaintiff was not interviewed as a part of the investigation "due to recent transfer." (*Id*.) The response further indicates that Plaintiff's medical record was not available for review because it had also been transferred. (*Id*.) Waiting almost three months to even begin the investigation of Plaintiff's grievance rendered the grievance process completely ineffectual.

Not to be deterred, and still experiencing problems with his injured hand, Plaintiff filed an appeal of his grievance on January 26, 2020, even though he was no longer confined at SCCC. (*See* Pl.'s Resp. at 90.) Defendant Dahne accepted the appeal on January 29, 2020, but no response to the appeal was forthcoming until May 17, 2021, almost seventeen months later. (*Id*.) At the time Plaintiff was interviewed for the appeal on May 13, 2021, he expressed his concern that his hand was not properly tended to in October 2019, and apparently indicated that he believed an opinion by a hand specialist would be a reasonable resolution of the grievance. (*Id*.)

REPORT AND RECOMMENDATION
PAGE - 19

The individual who responded to the appeal thereafter submitted a request for consult by a hand specialist. (*Id*.) Plaintiff, dissatisfied with that outcome, filed an appeal to the final level of the grievance process requesting that hand surgery be provided without further examination of his injured hand. (*Id*. at 92.) A response to Plaintiff's final appeal was provided on June 30, 2021, effectively upholding the level two response and noting that an appointment for an orthopedic consult had been scheduled for the following month. (*Id*. at 95.)

In total, it took almost twenty-one months for Plaintiff's grievance to be resolved. It is difficult to conceive how this process might in any way be deemed a reasonable or useful one. However, there is no evidence in the record demonstrating that the deficiencies in the process which, as already noted, do not implicate federal constitutional concerns, ultimately affected the medical outcome in this case. Plaintiff complains that his hand healed crookedly as a result of all of the deficient conduct alleged in his complaint. But there is no evidence that Plaintiff could not have obtained care for his hand, including a fix for the splint Plaintiff prematurely removed, had Plaintiff been willing to accept care on the terms on which it was offered.

### C.    Plaintiff's Motion for Admission of Personal Diary

Plaintiff seeks to admit into evidence his handwritten diaries in which he records daily events. (Dkt. # 52.) Plaintiff indicates that he believes his diaries will contradict the assertion of Defendant Lystad that she scheduled Plaintiff for a follow-up appointment on November 25, 2019. (*Id*.) However, nowhere in the record does there appear any assertion by Defendant Lystad that she scheduled Plaintiff for such an appointment. The only reference this Court was able to find in the record concerning events that may have transpired on November 25, 2019, was in the response to Plaintiff's initial grievance. (*See* Dahne Decl., Ex. A at 5.) The response indicated that a review of Plaintiff's medical care was conducted in the DOC's OMNI system and had

REPORT AND RECOMMENDATION
PAGE - 20

revealed the following: "On 11/25/19 notations indicates [sic] that you stated that you reported that you were hit on the head and lost consciousness, but the rest of your concern was that you were being unfairly punished for a fight that you did not start and had no relevance to your medical issues." (*Id.*) The notation did not indicate Plaintiff had been scheduled for a follow-up on November 25, 2019, and thus, Plaintiff's diaries on that point are irrelevant.

## IV.    CONCLUSION

Based on the foregoing, this Court recommends that Defendants' Motion (dkt. # 42) be GRANTED, and that Plaintiff's amended complaint (dkt. # 13) and this action be DISMISSED with prejudice. The Court further recommends that Plaintiff's motion for admission of his personal diary (dkt. # 52) be DENIED. A proposed Order accompanies this Report and Recommendation.

## V.    OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **November 11, 2022**.

DATED this 19th day of October, 2022.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 21